ELZABURU, RESPONDENT, *v.* CHAVES ET AL., APPELLANTS.

APPEAL from the District Court of San Juan, Section 1.

No. 799.—Decided March 4, 1913.

OPINION OF TRIAL COURT—TRANSCRIPT OF RECORD.—Although the opinion of the trial court does not necessarily form a part of the record, it is good practice to include it for the information of the Supreme Court.

EJECTMENT—ONUS PROBANDI—TITLE.—In order to sustain an action of ejectment it is necessary that the plaintiff allege and prove a genuine title to the property claimed, superior to that which the defendant may have.

ID.—The evidence taken in this case having been examined, the conclusion was reached that the plaintiff did not show that he was the sole and lawful owner of the parcel of land claimed with the right to recover the same from the possession of the defendants.

The facts are stated in the opinion.

*Mr. Manuel F. Rossy* for appellants.

*Mr. Jacinto Texidor* for respondent.

MR. JUSTICE DEL TORO delivered the opinion of the court.

This case involves the ownership of a certain parcel of land, the nullity of a possessory title proceeding and the record thereof in the registry.

The plaintiff alleges that the parcel of land claimed is a part of a property which was sold to him by the Spanish Government and that the possessory title proceedings instituted by the ancestor of the defendants are false and should be declared void. The defendants deny the right of the plaintiff and allege on their part that they are the lawful owners of the lands in dispute under purchase title acquired from Santos Caneti in 1875; that subsequently they established their possession and had the same recorded in their favor in the registry in the year 1896.

After an examination of the allegations and the evidence, the District Court of San Juan, Section 1, rendered judgment on March 24, 1911, deciding the case in favor of the plaintiff. A statement is made in the judgment that the same was rendered in accordance with the opinion delivered in the case,

but notwithstanding this fact the opinion has not been sent up to this court. We have stated on another occasion that even though the opinion is not necessarily a part of the record, it is good practice to include it in the same in order that the Supreme Court may be better informed.

This being an action of ejectment to recover title to real property, it devolves upon the plaintiff to prove at the outset that he is the lawful owner of the lands claimed and now in possession of the defendant.

On September 14, 1895, the Spanish Government recorded the possession of the following rural property without prejudice to third persons who might have better title:

"Tract of land situated at a place known as Honduras, in *barrio* Sabana Llana, district of Río Piedras, P. R., consisting of 112 *cuerdas,* equivalent to 44 hectares, 17 ares and 16 centiares, bounded on the north by lands of Frutos Caloca and Juana Rivera; on the south by lands of Laura García, formerly of Atanasio Vargas, Julia Zayas, Prudencio de la Cruz and the Succession of Luis Vázquez; on the east by lands of Ignacio Llompart, Valentín Rondón, Succession of Juan Hernáiz, Prudencio de la Cruz and María de la O. Andino, and on the west by lands of Atanasio, or Anastasio, Vargas, later of Laureano Rosario."

Said property was sold at auction on October 15, 1897, for $600, payable in 10 yearly instalments, and was acquired by Juan Manuel Cuadrado who assigned his rights to the plaintiff, Pedro de Elzaburu, on October 16, 1897; on the same day Elzaburu paid the first instalment into the Treasury and discharged the other instalments later. On October 17, 1898, the Secretary of the Treasury of the Insular Government of Porto Rico on behalf of the Government executed a deed of sale before a notary public, which deed was duly recorded in the registry in favor of Elzaburu.

But on attempting to take actual possession Elzaburu found the property occupied by different parties, among them Paula Chaves, defendant's ancestor. Thereupon Elzaburu addressed a communication to the Secretary of the Treasury

under date of April 5, 1899, stating that he had been unable to take possession of the property, as his assignor had been also, on account of the opposition of several people claiming to have possessory titles, for which reason he asked the department to eject the trespassers and put him in possession of the property.

As a result of this communication the chief clerk of the department reported to the chief of the Bureau of Internal Revenue the facts connected with the case and suggested that the mayor of Río Piedras be commissioned to go upon the property and put the purchaser in possession. There is nothing in the certified statement issued accordingly to show what action was taken by the Government or the result obtained therefrom. But judging from the testimony given by Elzaburu at the trial, it seems that the commission was in fact given to the mayor. The plaintiff testified that during the first part of 1900 he went upon the property accompanied by the mayor of Río Piedras and other persons to take possession of the premises, the adjoining owners being summoned; that "he called at the house of the Chaves family, who knew that the public sale had taken place and that the witness was the successful bidder, and who expressed to him their regret at leaving the place and handed over to him a certified copy of the record of their possessory title."

In his testimony Elzaburu seems to have maintained that he was in actual possession of all the land sold to him by the Government, but that fact is neither in harmony with this action of ejectment nor with the action of unlawful detainer brought by him formerly, nor with the other evidence taken showing that formerly Paula Chaves and now her heirs have been in possession of the lands claimed for many years as the owners thereof and have had their possessory title recorded in the registry of property since March 11, 1896.

Before entering upon the consideration of whether or not the Spanish Government ever acquired any right of ownership to the lands disputed and conveyed it to Elzaburu, we

will refer to two civil actions between the same parties litigating the same property herein referred to.

Both actions were of a special character. The first was a proceeding instituted by the heirs of Paula Chaves to convert their possessory title into a dominion title, which proceeding Elzaburu contested and in which a final decision was rendered denying the request of the petitioners. The second was an action of unlawful detainer brought by Elzaburu against the said heirs in which judgment was rendered against the plaintiff on the ground that it was not the proper action under the facts alleged.

In view of the foregoing the conclusion is easily reached that neither of said decisions is *res judicata* in respect to this case, which should be decided upon the merits of the allegations and the evidence introduced at the trial.

We will now enter upon an examination of plaintiff's title. Whatever right of ownership the plaintiff may have to the lands in question was acquired by him from the Spanish Government. If the Government never acquired any title whatever it is very clear that it could not have made any conveyance thereof to the plaintiff. Therefore it is necessary to ascertain whether the Government's title has been established.

Although the exact date is not shown, from the evidence introduced it may be deduced with all clearness that one Alonso María Hernández hypothecated a country property as security to guarantee the faithful performance of his duties as collector of revenue of Caguas. It seems that the collector committed a defalcation and the Government instituted the proper proceedings to recover the amount misappropriated.

Naturally, the proceedings should have been directed against the property pledged as security. The oldest data in the record concerning the action taken by the Government in connection with this property appears in a certificate issued by the mayor of Río Piedras in which the statement is made that in "a proceeding instituted for the establish-

ment of boundary lines, survey and appraisement of the property belonging to the collector of Caguas, Alonso María Hernández, there is a record to the effect that on May 25, 1875, the Government seized said lands and placed them in the custody of Eusebio Chiclana.'' The lands are not described. Nothing is said even as to where they are located.

After this, according to a certificate issued by the Commissioner of the Interior, it seems that about the year 1884 ''a survey of the property belonging to Alonso Hernández in 1854 situated at Sabana Llana, Río Piedras, was made by order of the Treasury Department.'' In the statement of the case prepared by the appellant, which was certified to by the trial judge and not objected to by the appellee, no further reference is made to this survey.

Then, according to a communication signed by Surveyor Hernáiz, to which we shall refer in the following paragraph, the mayor of Río Piedras, assisted by Surveyor Viera, made a survey in 1885 of the property of Collector Hernández.

In the year 1886 Surveyor Hernáiz addressed a communication to the Chief of the Bureau of Internal Revenue ''informing him that, in pursuance of the said chief's communication of February 23 ultimo, he went to Río Piedras and obtained from the mayor's office the records and data concerning the property of Collector Hernández, among which was a copy of the deed executed by the brothers Otero to Hernández in Cayey and the report of the survey made last year by the mayor and Surveyor Viera (who owns lands adjoining those occupied by María Chaves) in the presence of witnesses Santana and Llompart; that the deed does not give any courses or distances but simply refers to the boundaries by cardinal points, wherefore it is impossible to ascertain whether the land mentioned in the deed existed in 1856 when the sale to Hernández was made; that in the report of the survey there are found the courses and points serving as boundaries for the survey and with which all the adjoining owners are satisfied except María Chaves who is occupying

and using the land seized by the Government and purchased by her from the Successors of Caneti, she exhibiting receipts as proof that she had made certain payments thereon; that he proceeded to make a survey of the land mentioned in the report of the former survey and made a detailed plan thereof, which plan shows an area of 34.23 *cuerdas,* or one-fourth of the quantity appearing to have been sold to Collector Hernández. In order to get at the truth of the matter a general examination of the titles of the adjoining owners should be made.''

In 1892 a new survey of the land was made by García Saenz, a clerk of the department. The report made by this official says ''that he looked over the proceedings for defalcation brought in 1854, from which he learned that lack of data concerning the boundaries and location of the land was the reason why the different surveys attempted, so that the Government might recover the land forfeited by the defalcation, were fruitless; that the seizure of the property by the mayor of Río Piedras on behalf of the Government, which is more a matter of record than of fact, included only from 40 to 50 *cuerdas,* and it was stated that Hernández had never been known as an owner of property in that *barrio;* that the lands seized were once the property of Juan Otero, who resided there about the year 1820, at which time on moving to Caguas he left Juan Caneti in charge, who remained in charge up to his death, after which his son sold the property to Clemente, the husband of Paula Chaves, who was in possession at the time of the seizure; that neither from the record of the seizure proceedings nor from the deed of the Oteros executed May 5, 1854, nor from the plan made of the property in March, 1886, which is the only plan known    *    *    * (hiatus) steps be taken, although restricted to 34 *cuerdas* which is the acreage occupied by Paula Chaves as her own, can any definite information be obtained by which to identify the lands which really belong to Hernández, for the public deed of the Oteros only gives as boundaries the lands belonging to

the Marchioness de León and José de la Cruz without fixing
the location or the points and corners of its limits, referring
simply to an approximate area of from 140 to 150 *cuerdas;*
that he proceeded to make a survey of the entire zone where
the lands are supposed to be located, so that with the plans
and titles of the owners he might identify the lands belonging
to Hernández; that with this end in view the owners were
summoned and the investigation was made with the following
result: The occupants of parcels Nos. 3, 5, 6, 9, 10, 11 and 12,
who are María Nieves, Paula Chaves, José Martínez, Fran-
cisco Guerra, Teodoro Guerra, Gregorio Chaves and Dionisio
Cruz, failed to present any authentic instrument. Therefore
the said seven parcels may be considered as forming part of
the 112 *cuerdas* and 1,921 square yards, and the seizure of
these properties may be ordered and the sale thereof pro-
ceeded with.''

　In the same year 1892 the Secretary of Finance decided
that in order to be able to pass upon the legality of the titles
presented to the civil engineer at the time he was surveying
the property of Collector Hernández it was necessary that
said owners should deliver to him whatever possessory titles
they might have in order that an examination thereof might
be made. This is the inference drawn from a communication
addressed to the mayor of Río Piedras on August 11, 1892,
by virtue of which the mayor served the owners with notice
to appear, which was complied with by Gregorio Chaves who
made the statement that the document he had showing that
he had acquired title to his land was burned the year before.

　It does not appear that any steps were taken immediately
by the Government, but it does appear that three years after,
in 1895, the Chief of the Bureau of Internal Revenue of Porto
Rico, by order of the Secretary of the Treasury, addressed a
communication to the mayor of Río Piedras directing him to
take possession in the name of the Government of the estate
measuring 112 *cuerdas* which was described, and that on June
5, 1895, the mayor seized and took possession of the prop-

erty in the name of the Government, according to the record made by him at the time. No record exists of the details of the act of taking possession.

The certificate issued by the registrar of property relative to the first record of the property of 112 *cuerdas* sold afterwards to Elzaburu shows that said first record was made in favor of the Spanish Government "which stated that it was the owner thereof as the result of the seizure or adjudication in the proceedings prosecuted against Alonso Hernández as collector of Caguas to recover the sum of $7,776.62 claimed from him, said adjudication having been carried into effect on July 5, 1895." The record was one of possessory title and was entered on September 14, 1895.

From the preceding statements we are informed of the numerous difficulties encountered by the Spanish Government in its endeavor to identify the property alleged to belong to Collector Hernández, and that from its first attempt to take possession thereof the Chaves family was found in possession of the lands, claiming that they had acquired the title thereof by purchase and that they had never been ejected from the premises by a final and lawful order of any competent authority.

The fact is that although Collector Hernández pledged certain country property as security, it is very doubtful that Hernández was as a matter of fact the owner of the property to which he seems to have made reference. This is the origin of all the difficulties.

In proof of Hernández's title to the property which he hypothecated to guarantee the faithful performance of his duties, there was introduced "a copy of a public deed executed at Cayey on May 5, 1854, before the mayor of that town, Sebastián Colón, by José Saturnino, Isidora, María Fruta and Daría del Otero, stating that in their own right and promising the acquiescence of their brothers, Bonifacio and Demetrio del Otero, they sell to Alonso María Hernández a property situated in *barrio* Honduras of Río Piedras, adjoining

the lands of the Marchioness de León and José de la Cruz and containing between 140 and 150 *cuerdas,* the exact num ber of which shall be set forth in the public deed to be exe- cuted for the purpose, together with its points and boundary lines when surveyed, for the sum of 2,200 *pesos* cash, which amount they acknowledged to have received. Said deed was signed by the brothers and sisters, José Saturnino, María, Isidora, Daría and Justa del Otero, and by Sebastián Colón as successor of Lucas Vázquez; but the signatures of the wit- nesses, whose names as given in the deed are Sebastián Po- rrata, Ramón Pacheco and Felipe Agüero, do not appear.''

And as a record of still an older date, the plaintiff intro- duced a 'copy of certain proceedings signed by the general keeper of protocols of the notarial district of San Juan from which it appears that about the year 1836 José Concepción de Castro, as testamentary executor of his mother, Eugenia de la Cruz, addressed a communication to the mayor of San Juan stating that his ancestor and her brother, José, inherited from their grandparents a piece of land situated in Honduras, Río Piedras, which she sold in 1819 to Juana María del Otero, who without a deed thereto had been occupying it ever since as property of her own; and that on account of the death of his mother he instituted proceedings to prove that she had inherited that property and had sold it afterwards to said Juana María del Otero.

In the proceedings the adjoining owners and the *Síndico Procurador General* were cited and the following witnesses testified:

1. *José de la Cruz,* brother of Eugenia, stated that he and his sister inherited a property, one-half of which his sister possessed for over 20 years until she sold it to Juana María del Otero in 1819, and ''that being an adjoining owner he has seen Juan Caneti for many years occupying said prop- erty, although he was unable to say under what title he was occupying same.''

2. *Juan José Giménez* said that ''he knew the farm as the

property of the parents of Eugenia and José de la Cruz; that they inherited it and that José transferred his share to Eugenia who afterwards sold it to Mrs. Otero; that he is unable to say anything with regard to the possession of the property by Mrs. Otero because he has seen Juan Caneti for some years occupying same, not knowing, however, under what title or right he did so." ·

3. *Juan Gregorio Feliz* testified the same as the preceding witness.

4. *Domingo de Castro* stated that "the fact of the sale to Mrs. Otero was true, but that he did not know whether or not she possessed same uninterruptedly for the reason that he had not been in Honduras for a good many years;" and

5. *Facundo de Castro* stated that "from the time he was 12 years of age until he was 25 he knew the property at Honduras as belonging to José de la Cruz, father of Eugenia and José, who had inherited it; José having sold his share to Eugenia who, as he had heard, sold it to Mrs. Otero, from which time he knows nothing about the matter; that he had heard that Juan Caneti was in possession thereof, but that he does not know under what title."

When the taking of testimony was concluded the *Síndico* stated that in his judgment the proceedings should be approved because the ownership of the property had been duly shown and the fact that the witnesses had stated that the property was in the possession of Caneti did not affect the legality of the right sought to be proven since "Doña Juana might have leased it or sold it to Caneti."

It does not appear that Caneti was either summoned or heard. The proceedings were finally approved by the Court of San Juan, May 20, 1836.

After a comparison of the boundary lines and a study of all the evidence introduced it is evident that the property formerly possessed by Paula Chaves and now by her heirs, the defendants herein, is comprised within the boundaries which the Spanish Government fixed for the properties sold

to the plaintiff Elzaburu., In regard to the question of iden-
tification there can be no ground for doubt. But there is a
doubt as regards the question of ownership of such a degree
that, in our judgment, it is impossible to reach the conclusion
that the plaintiff has proved that he is the sole and lawful
owner of the parcel of land claimed and has the right to re-
cover the title and possession thereof from the defendants.

A careful examination of the proceedings instituted in
1836 discloses the facts that no description of the property
is given; that even the witnesses for the petitioner failed to
establish the possession of Mrs. Otero, limiting themselves
to the fact of the sale and referring, besides, to the fact of
the possession by Juan Caneti and that the *Síndico* himself,
in proposing that the proceedings be approved, said that
"although the witnesses had stated that the property was in
the possession of Juan Caneti, this did not affect the legality
of Doña Eugenia's right and that Doña Juana might have
leased it or sold it to Caneti." It may be seen, therefore,
that there is some obscurity with regard to Juan Caneti. Had
he been a mere lessee or manager of the property, acting in
harmony with the real owner, the witnesses and the *Síndico*
would not have referred to him in the manner they did. It
seems that even since that remote date there existed conflict-
ing interests as to the ownership of the property being liti-
gated in this suit.

If we pass from 1836 to 1854 we will find the deed of sale
said to have been executed by the Otero brothers to Hernández.
This deed, which is the basis upon which the rights of Her-
nández rest, and consequently those of the Spanish Govern-
ment and the plaintiff Elzaburu, is so defective that we can-
not consider it as a real public instrument since the signa-
tures of the persons who are said to have witnessed the deed
are lacking. Furthermore, the exact connection between
Juana María Otero, who was shown to be the owner of the
property in 1836, and the Otero brothers who sold it in 1854,
has not been established nor does it appear that the brothers

Demetrio and Bonifacio del Otero ever ratified the deed, nor that in compliance with the provisions of this deed another was made as agreed upon fixing the points and boundary lines and the exact number of *cuerdas* of the property sold.

Having only such a frail basis as that afforded by the deed of 1854 explains why the Spanish Government, notwithstanding its power and great facilities, delayed 20 years in pursuing the property to which the said deed seems to refer and in finally deciding to record its possessory title in the registry of property.

The difficulties arose when the embezzlement was discovered and an effort was made to recover the debt out of the property which was pledged as security by the collector to guarantee the faithful performance of his duties. The property was not found. It is not known how the seizure in 1875 was carried into effect, nor the exact number of *cuerdas* seized, nor the exact location of the property. In 1885, 10 years after the seizure, only 34 *cuerdas* could be found of the 140 to 150 which the property sold by the Otero family to Hernández was supposed to contain, according to the survey made by surveyor Viera.

There appears in an official document issued in 1886 by Surveyor Hernáiz the statement that all the adjoining owners were satisfied with the survey made by Viera "except María (?) Chaves, who was occupying and using the land seized by the Government and purchased by her from the successors of Caneti, she exhibiting receipts as proof that she had made certain payments thereon."

In 1892 Civil Engineer García Saenz spoke of the surveys made as fruitless and of the seizure made by the municipality in the name of the Government as "more a matter of record than of fact," stating besides that when said seizure was being made it was shown that "Hernández had never been known as an owner of property in that *barrio*." Notwithstanding these facts as established by him, said civil engineer concluded his report with the statement that as a num-

ber of persons, among them Paula Chaves, had no lawful titles to the properties of which they were in possession, amounting in all to 112 *cuerdas,* "the actual seizure thereof may be ordered and its sale proceeded with."

This was carried into effect three years later by the Government which decided for itself that it had a right to the possession of the 112 *cuerdas* and ordered the mayor of Río Piedras to seize the same. Its right was recorded in the registry of property and conveyed later to the plaintiff Elzaburu.

As we have already said, there is no record of the details connected with the act of taking possession of the 112 *cuerdas* by the mayor on behalf of the Government, but the fact remains that if those 112 *cuerdas* included the 50 *cuerdas* possessed by Paula Chaves she continued in possession thereof, and not only did she remain in possession but she obtained a certificate from the said mayor of Río Piedras wherein it was stated that she possessed the property as the owner thereof for the purposes of the possessory title proceedings approved in that same year, 1895, in which the taking of possession by the Government is alleged to have occurred.

With regard to the plaintiff Elzaburu we should further state that according to the testimony given by him at the trial he had knowledge of every detail in connection with this case owing to the fact that as a clerk employed in the Bureau of Internal Revenue he took part in the administrative proceedings thereof up to the time when the property was recorded in the registry of property.

Under such circumstances it cannot possibly be concluded that the plaintiff, who has brought an action of ejectment in this case, has shown that he and he alone is the lawful owner of the 50 *cuerdas* possessed by the defendants.

This opinion becomes still stronger after making an examination of the evidence offered by the defendants in support of their counterclaim.

Said evidence consisted of the testimony of witnesses,

some of them of advanced age, all of which tended to show that the original owner of the parcel of land in dispute was Juan Caneti; that from him it passed to Santos Caneti, his son, who sold it to Ramón Clemente, the husband of Paula Chaves, from whom the ownership descended later to Paula and her children by Clemente, which children now hold the title. Said evidence consisted also of documents showing that Paula Chaves y Cruz proved that "she had been in possession of the property since 1875, when she purchased it from Santos Caneti," and accordingly instituted the necessary proceedings in connection with which the adjoining owners were summoned and testimony was taken from several witnesses, which proceedings were approved November 7, 1895, and recorded in the registry of property March 11, 1896; of the fact that taxes had been paid; of certain court decisions relating to the designation of heirship, and of the judgment rendered in the action of unlawful detainer hereinbefore mentioned, etc.

After a review of all that evidence in relation to that of the plaintiff, the conclusion is reached that the rights of the defendants date from 1875, at least, when their ancestor made the purchase from Santos Caneti, the son of the Juan Caneti referred to in the proceedings instituted in 1836, and in reference to whom the *Síndico* said that the property might have been leased or purchased by him from Mrs. Otero. The Canetis were in constant possession, whether as the lawful owners or not is not clear, but it is certain that they were in possession before 1836 and that the defendants have been in possession as owners since 1875, that they secured judicial acknowledgment of their possession in 1895 and recorded the same in the registry in 1896. It may be said that their possession was interrupted since 1875 by virtue of the attachment levied by the Government and subsequently by the repeated acts of the same Government and of the plaintiff, but the fact is that neither the former with all its power nor the latter by resorting to every legal means available ever had

been able to succeed in ejecting them from the property, and in this suit the title of the plaintiff having been put to the test, we have reached the conclusion that it is not sufficient.

For the foregoing reasons the judgment appealed from should be reversed and the complaint dismissed, without special taxation of costs.

*Reversed.*

Justices Wolf and MacLeary concurred.

Mr. Chief Justice Hernández dissented.

Mr. Justice Aldrey did not take part in the decision of this case.

### DISSENTING OPINION OF MR. CHIEF JUSTICE HERNÁNDEZ.

By a public deed executed in the town of Cayey on May 5, 1854, before the mayor, Sebastián Colón, the brother and sisters, José Saturnino, Isidora, María, Fruta and Daría del Otero, acting for themselves and guaranteeing the cooperation of their brothers, Bonifacio and Demetrio del Otero, sold to Alonso María Hernández for 2,200 *pesos,* cash, a property situated in the ward of Honduras, of Río Piedras, containing from 140 to 150 *cuerdas* and adjoining lands of the Marchioness de León and José de la Cruz. It was stated in said deed, which was signed by the contracting parties present, but not by the witnesses to its execution, whose names were given as Sebastián Porrata, Ramón Pacheco and Felipe Agüero, that the exact number of *cuerdas,* together with the points and boundary lines, would be set out in the deed which would be executed for that purpose after a survey of the property.

Subsequently Alonso María Hernández hypothecated said property in favor of the Spanish Government to guarantee the faithful performance of his duties as collector of taxes and revenues of Caguas and administrative proceedings were instituted against him to recover for a defalcation. After many difficulties in connection with fixing the boundaries and

surveying the property in question, a new survey thereof was
made in 1892 by García Saenz, a duly authorized official, who
surveyed the entire zone where the lands were supposed to be
located and settled upon 112 *cuerdas* and 1921 Spanish square
yards as the land subject to seizure and sale by the Govern-
ment in satisfaction of the liability incurred by Hernández.

The land in question, of the area stated, was adjudicated
to the Spanish Government on July 5, 1895, and recorded in
its name in the registry of property on September 14 of the
same year. On October 15, 1897, it was acquired at public
auction by Juan Manuel Cuadrado, who conveyed his rights
to the plaintiff, Pedro de Elzaburu, on October 16 of the
same year and executed a deed of sale thereof to Elzaburu
on October 17, 1898, which deed was recorded in the registry
of property in the name of Elzaburu.

When Elzaburu attempted to take possession of a portion
of said land, *i. e.*, a parcel of 50 *cuerdas* which was in the
possession of the defendants and had been recorded in the
name of their ancestor, Paula Chaves, on March 21, 1896, or
subsequent to the record made in favor of the Spanish Gov-
ernment, he was confronted by the complications which have
given rise to this suit in which both parties claim the owner-
ship of the parcel of land.

As held by this court in its opinion, it is manifest that
the property formerly possessed by Paula Chaves and now
by her heirs, the defendants, is within the limits set by the
Spanish Government to the property sold to the plaintiff,
Elzaburu, and in our opinion the conclusion should be reached
also that Elzaburu is the sole and lawful owner of the parcel
of land claimed.

Elzaburu derives his title from the Spanish Government,
the latter from Alonso María Hernández and he, from the
Otero brother and sisters by virtue of a public deed executed
on May 5, 1854.

Said deed is a genuine public instrument; for, although
the signatures of the witnesses who were present at its exe-

cution are lacking, their signatures were not required by the law then in force, but only the presence of the witnesses, and the fact of their presence has not been put in issue. Nor does the circumstance that it does not appear that a subsequent deed was executed wherein the points and boundary lines of the property were fixed, vitiate the deed; for these could be determined, as they have been, in a different manner; i. e., by means of the corresponding survey. Nor does the failure of the brothers Demetrio and Bonifacio del Otero to ratify the deed invalidate it, inasmuch as their brother and sisters, the vendors, guaranteed their cooperation, which signifies that they responded for the acceptance by the said Bonifacio and Demetrio of the deed, and the defendants have not alleged that Bonifacio and Demetrio have at any time offered any objection to the sale.

It is true that in the proceedings brought about the year 1823 and approved by the mayor of San Juan it was proven that Eugenia de la Cruz and her brother, José, inherited from their grandparents a property in Honduras, Río Piedras, which property was sold in 1819 to Juana María de Otero, and it may be deduced also from said proceedings that Juan Caneti entered into possession and enjoyed the use of the said property, but it is not known under what title or right. José de la Cruz testified in the proceedings that his sister Eugenia possessed one-half of the property for more than 20 years until she sold it to Juana María de Otero, which shows that José de la Cruz remained in possession of the other half, and this is corroborated by the fact that he is named as an adjoining owner of said property.

It is stated also in the deed of May 5, 1854, executed in favor of Alonso María Hernández by the Oteros, that the property referred to joins the properties of the Marchioness de León and José de la Cruz, which may lead us to believe that the property which belonged to Eugenia and José de la Cruz is the same, in whole or in part, as that described in the deed of May 5, 1854.

It was not shown at the trial under what title Juan Caneti entered into possession of the property sold to Juana María de Otero, for the witnesses who testified in the aforesaid proceedings were ignorant on this point, and the *Síndico* in suggesting that the proceedings be approved stated that the ownership of the property had been duly established and that the fact that the witnesses testified that the property was in the possession of Caneti did not affect the legality of the right sought to be established, inasmuch as Doña Juana might have leased or sold it to Caneti.

. The proceedings were instituted to prove that Eugenia de la Cruz and her brother José inherited the property from their grandparents, Eugenia having sold her share in 1819 to Juana María de Otero, who, without a title deed, had been in possession since that time, and not to show that Juan Caneti had any title to the property; but as the proceedings developed the fact that Juan Caneti was in possession, although his title was not shown, the *Síndico* concluded that Caneti's possession did not affect the legality of the right of ownership sought to be established, inasmuch as the possession of the property might have been held by Caneti as owner under title of purchase or as lessee.

Caneti did not obtain from Juana María Otero a lawful title to the possession of the lands which the latter acquired from Eugenia de la Cruz, but was a trespasser, judging from the report made by the duly accredited official, García Saenz, in the year 1892, which stated that the lands seized belonged to Juan Otero who lived in the *barrio* of Honduras in the year 1820, when he changed his residence to Caguas and left Juan Caneti in charge, who remained in possession up to the time of his death, after which his son sold said lands to Clemente, the husband of Juana Chaves, said Clemente holding possession at the time of the seizure.

The defendants have not presented any title as good as or better than the public deed of May 5, 1854, from which the plaintiff derives his title, for there was no proof that

Caneti, from whom the defendants derived their rights, lawfully acquired the property from Juana Otero. A more feasible conclusion is that the Oteros referred to in said deed of May 5, 1854, inherited from Juana Otero the property sold to Hernández and afterwards seized by the Treasurer of Porto Rico.

In any event, Hernández's title, from which Elzaburu derives his ownership, is valid and should be sustained unless the defendants show that it is false. No proof to that effect was introduced at the trial. We do not know under what title and in what circumstances Juan Caneti acquired the property from Juana María Otero. Nor do we know that Santos Caneti was the sole heir of Juan Caneti. Nor can the defendants show that they acquired a title of ownership by prescription. Finally, the record of the possessory title to the property in litigation in the name of The People of Porto Rico was entered in the registry prior to the entry of a like possessory title in the name of the defendants and this is a sufficient reason for the nullity of the later record.

For the foregoing reasons the judgment appealed from decreeing that the title of ownership to the property in litigation is in the plaintiff who has the right to recover it, and that the possessory title recorded in the registry of property in the name of the defendants is null and void, should be affirmed.